**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0212n.06

No. 17-2086

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Apr 24, 2018

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| RONALD DAVID MARTIN, | ) | |
| | ) | |
| **Petitioner-Appellant,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| RANDALL HAAS, Warden, | ) | |
| | ) | **OPINION** |
| **Respondent-Appellee.** | ) | |
| | ) | |

Before: MOORE, THAPAR, and BUSH, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Petitioner-Appellant Ronald Martin appeals the district court's denial of his petition for a writ of habeas corpus. Martin was convicted by a Michigan jury of nine counts of criminal sexual conduct, all involving his teenaged daughter. Martin's petition centers on his trial attorney's failure to litigate fully, and the trial court's failure to grant, his motion to admit evidence of his daughter's sexual relationship with an older teenager and his disagreements with her over that relationship as a motive for a false accusation. For the reasons that follow, we **AFFIRM**.

**I. BACKGROUND**

Because the facts surrounding this case have been repeated in detail already, *see generally People v. Martin*, No. 293129, 2011 WL 445806, at *1–4 (Mich. Ct. App. Feb. 8, 2011); R. 26 (Dist. Ct. Op. & Order at 1–10) (Page ID #1325–34), we focus on the facts most

central to the issues on appeal. Martin is the father of the complaining witness, S.W.[1] Martin and S.W.'s mother were themselves teenagers when S.W. was conceived, and they never married. *See* R. 6-6 (Trial Tr. Vol. II at 13) (Page ID #337). S.W. lived with her mother, but regularly spent the night at Martin's residence. *See id.* at 14–16 (Page ID #337–38).

Encouraged by her best friend, O.R., S.W. first reported sexual abuse by her father to an adult in October 2008. *Id.* at 71–73 (Page ID #352). The trial followed in May 2009, by which time S.W. had turned sixteen years old. *See id.* at 3, 36 (Page ID #335, 343). At trial, the jury heard S.W. testify in detail about six occasions—spanning roughly from the end of January 2008 through August 2008, while S.W. was fourteen and fifteen years old—during which Martin had sexually abused her, including through groping, digital penetration, and penile-vaginal rape. *See id.* at 40–68 (Page ID #344–51). S.W. testified that she had confided in O.R. "[a]t that [sic] end of February" about an instance of groping, *see id.* at 45 (Page ID #345), but that she did not tell anyone anything further until the October allegations, in part because Martin had "asked [her] to promise not to tell, and [she] didn't want to talk about it," *id.* at 101 (Page ID #359). On cross-examination, Martin's lawyer elucidated inconsistencies in S.W.'s account of the alleged abuse:

(1) that she had told her mother that all of the incidents occurred at Martin's brother Don's house but no longer maintained that to be true, *id.* at 82 (Page ID #354);

(2) that she had "mixed two [incidents] together" both when describing the beginning of the abuse to Amy Allen (a forensic interviewer at a local child-advocacy nonprofit called Care House, as well as a prosecution witness) and

---

[1]Because the complainant and several of her associates were minors at the time of the events giving rise to this case, we will use initials to protect their identities.

> when testifying at a preliminary examination, *id.* at 97–101 (Page ID #358–59);
>
> (3) that she had contradicted on cross her direct-examination testimony that another incident had concluded when her younger sister, M.M., entered the room, *id.* at 109–10 (Page ID #361);
>
> (4) that she had alternately described this same incident as having occurred during the "[e]nd of spring" and the summer, *id.* at 111–12 (Page ID #362);
>
> (5) that her testimony on direct examination regarding where she got dressed after the alleged abuse and whether a phone call had preceded or interrupted the alleged abuse differed from her statements at the preliminary examination, *id.* at 116–18 (Page ID #363);
>
> (6) that she had told Allen that two of the rapes had occurred in bunk beds but no longer maintained that to be true, *id.* at 121–22 (Page ID #364); and
>
> (7) that she had told Allen that the abuse had begun after Martin moved into Don's house[2] but now maintained that it had begun slightly earlier, while he was still living in his own home, *id.* at 123–25 (Page ID #365).

S.W.'s general response to these inconsistences on cross-examination was that she did not remember everything perfectly and that she had generalized at times in the past. *See, e.g.*, *id.* at 98, 122, 124–25 (Page ID #358, 364–65). She also explained on redirect that it was "embarrassing to talk about." *Id.* at 144 (Page ID #370).

Martin's counsel also impeached S.W. in other ways. S.W. admitted on cross-examination:

> (1) that she had stayed at Martin's house more frequently than before during the time of the alleged abuse, *id.* at 83 (Page ID #355);
>
> (2) that she had continued sleeping in a bed with Martin after the first alleged incident of abuse, *id.* at 87–88 (Page ID #356);
>
> (3) that she had explained going to Martin's house by saying that it was to spend time with M.M., but that she had also gone when M.M. was not there (which

---

[2]According to the testimony of Don Martin's domestic partner, Martin moved into their house in February 2008. R. 6-7 (Trial Tr. Vol. III at 112) (Page ID #405).

she explained by saying that she wanted to be there to support her father while he was unable to see M.M.), *id.* at 102–05 (Page ID #359–60);

(4) that she had preferred to stay at Martin's house rather than her grandmother's house whenever M.M. was at her grandmother's house because M.M. "would get [her] in trouble," *id.* at 135 (Page ID #368);

(5) that she had testified on behalf of Martin in a protection-order hearing regarding M.M. while the alleged abuse was ongoing, *id.* at 137–38 (Page ID #368); *see also id.* at 151 (Page ID #372);

(6) that the alleged abuse had ceased in August but that she had not reported it until October 21 or 22, *id.* at 127–28 (Page ID #366); and

(7) that she and Martin had an argument a day or two before she reported the alleged abuse in which he had declined to add her to his cell-phone plan unless her grades improved, *id.* at 129–30 (Page ID #366).

S.W. also testified, in response to questions from the jury, that she had continued to sleep in the same bed as her father following the alleged abuse because the couch that was available hurt her back. *Id.* at 153 (Page ID #372). She also testified that she had not made any documentation of the abuse. *Id.* at 154 (Page ID #372).

Among other prosecution witnesses, the jury also heard from S.W.'s pediatrician, Dr. Stacy Gorman, who testified that she examined S.W. on October 22 but did not perform a full pelvic exam because she had already done one in August and "didn't feel the need to repeat it." R. 6-7 (Trial Tr. Vol. III at 9–10) (Page ID #379). S.W.'s best friend, O.R., also confirmed via direct testimony that S.W. had confided in her about the groping prior to the full revelation in October, but on direct the prosecution gave the time frame as "early summer," *id.* at 16 (Page ID #381), and on cross-examination O.R. admitted that she could not remember when it was, indicating that it could have been any time between January and September, *id.* at 21–23 (Page ID #382). And Allen, the forensic interviewer, told the jury that it is not unusual for sexual-

abuse victims, including adolescents abused by family members, to try to pretend that nothing is going wrong, to delay reporting the abuse, and to mix up or misremember details, especially as time passes. *See id.* at 54–59, 64–65, 84–86, 92–101 (Page ID #390–91, 393, 398, 400–02). Allen also testified that part of the protocol for preparing to interview a child accusing an adult of sexual abuse is to generate "an alternative hypothesis" so that the interviewer "stay[s] in neutral with letting the child tell you what, if anything[,] happened" and keeps "an open mind." *Id.* at 103–04 (Page ID #402–03).

The defense's case was not overwhelming. The defense called Martin's brother Don's domestic partner, Eric Sandmire, who testified that he did not "notice any change in [S.W.'s] demeanor" between February and September 2008. *Id.* at 113 (Page ID #405). Sandmire also testified to being present for one argument over the cell-phone plan between Martin and S.W. and to hearing one side of another argument. He recalled that Martin seemed "very calm and [was] trying to reason with [S.W.]," and that Martin was "upset" after the phone call because S.W. "hung up on him." *Id.* at 116–18 (Page ID #406). Sandmire described S.W.'s relationship with M.M., meanwhile, as "[l]ove/hate," *id.* at 118 (Page ID #406), and indicated that S.W. was jealous of M.M., *id.* at 121–23 (Page ID #407). He also confirmed that Martin and S.W. shared a bed "a couple of times a month" after Martin first moved in because the couch "was apparently uncomfortable," *id.* at 124 (Page ID #408). He testified that there "was nothing unusual about that as far as [he] knew." *Id.*

Don Martin also testified on behalf of the defense. He stated that S.W. seemed "very jealous of [M.M.]" and the fact that M.M. got to live with Martin; Don recalled S.W. regularly

5

calling M.M. "a spoiled brat" in his presence. *Id.* at 141 (Page ID #412). Don also confirmed that S.W. had slept in Martin's bed at times, *id.* at 145–46 (Page ID #413), and that she was a regular overnight guest at their house during the period of the alleged abuse, staying over "two and three days a week" at least a couple of times during the summer, *id.* at 148 (Page ID #414).

At closing argument, Martin's lawyer offered five reasons that the jury should doubt S.W.: (1) there were inconsistencies in her story (though counsel admitted that some of these were "minor"), R. 6-8 (Trial Tr. Vol. IV at 46–52) (Page ID #430–32); (2) her behavior (for example, continuing to share a bed with Martin) seemed inconsistent with the alleged abuse, *id.* at 53–57 (Page ID #432–33); (3) the cell-phone argument might have "provoke[d] something," *id.* at 59 (Page ID #434); (4) there was "jealousy" of M.M. and potentially also of Martin's new girlfriend, *id.* at 59–60 (Page ID #434); and (5) teenagers in general are psychologically and emotionally unpredictable, *id.* at 60 (Page ID #434). Not surprisingly, the prosecution questioned whether any of these final three suppositions was a sufficient motive to make up allegations of this gravity. *See id.* at 66 (Page ID #435). The jury ultimately convicted Martin, and he was sentenced to concurrent sentences of fifteen to thirty years of imprisonment for each of five counts of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b, and eight to fifteen years of imprisonment for each of four counts of second-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520c.

What Martin argues was missing from his trial—and what this appeal hinges on—is a line of potential impeachment regarding S.W.'s relationship with a nineteen-year-old boyfriend, Stephen Cartier, that the trial court excluded under the auspices of Michigan's rape-shield

6

statute. That law excludes "[e]vidence of specific instances of the victim's sexual conduct" from admission at trial, subject to two narrow exceptions not at issue here. *See* MICH. COMP. LAWS § 750.520j. We will simply call this centrally disputed potential line of impeachment "the disputed evidence" for short.

According to an affidavit that Martin filed as part of his post-conviction direct appeal, Martin and S.W.'s mother learned in spring 2008 that S.W. was sexually active with Cartier. R. 2-2 (Martin Aff. at 1) (Page ID #94). In response, they took her to see a doctor and forbade further contact with Cartier. During summer 2008, however, Martin learned that S.W. was still seeing Cartier. He told her that if their relationship continued, he would report it to the police and that Cartier "could 'end up in jail.'" *Id.* Even so, Martin encountered further evidence later that summer that the relationship had continued. At that point, he confronted S.W. in Sandmire's presence, stating: "I don't know how many times I have to tell you. You are not allowed to see him (Steven) [sic]. If you don't end it, I will, and he'll be in jail." *Id.* Then, just prior to the sexual-abuse allegations, S.W. asked to join Martin's cell-phone plan, and Martin said that he would consider it if her grades improved *and* she cut off contact with Cartier. *Id.* Martin avers that S.W. responded: "I have no use for you." *Id.* at 2 (Page ID #95).

Sandmire filed an affidavit confirming the relevant details in Martin's affidavit, *see* R. 2-2 (Sandmire Aff. at 1) (Page ID #92), and Cartier filed an affidavit admitting to having been in a relationship with S.W. and confirming that she told him that her parents had taken her to a doctor after learning of the relationship, R. 2-2 (Cartier Aff.) (Page ID #103). Cartier also asserted that S.W. was "someone who will often manipulate a situation to get her own way, and that she does

not have a reputation for being an honest person." *Id.* He added that "[d]uring arguments," S.W. had "on several occasions[] threatened to get me in trouble for our relationship by having her father press charges against me." *Id.* He attested as well that, "[d]uring the whole time" of the relationship, S.W. had "never claimed to [him] that her father was having sex with her" and had never "appear[ed] to [him] to be traumatized in any way." *Id.*

Trial counsel knew about this potentially impeaching material and accordingly filed and argued a motion to admit it despite the rape-shield law, *see* R. 6-3 (Mot. Hr'g Tr.) (Page ID #276–88), which prohibition the Michigan Supreme Court has made clear must, pursuant to "the sound discretion of the trial court," yield when exclusion would "unconstitutionally abridge the defendant's right to confrontation," *see People v. Hackett*, 365 N.W.2d 120, 125 (Mich. 1984). The trial court ultimately denied the motion without explanation. R. 11-1 (Mich. Cir. Ct. Order) (Page ID #803). Importantly, however, the summary order included, toward the bottom of the page, the following phrase: "Denied without prejudice. The Court will revisit the issue after hearing the prosecution's evidence at trial." *Id.* Counsel never renewed the motion.

After his conviction, Martin obtained new counsel, who in turn filed a motion for a new trial. R. 2-2 (Def.'s Mot. for New Trial at 1) (Page ID #72). Martin's new counsel asserted, among other claims, (1) that Martin was "deprived of the effective assistance of counsel where defense counsel failed to properly and fully litigate a request to introduce evidence excepted under the rape shield statute," and (2) that "in light of the prosecution's introduction of medical testimony regarding the complainant's earlier pelvic examination, and in light of the prosecution's introduction of expert testimony that the Care House 'team' had ruled out

8

alternative hypotheses for the complainant's allegations, the court's pretrial ruling excluding complainant's sexual history and motive to fabricate constituted plain error, and the defendant was deprived of his right to confront the witnesses and the right to present a defense." *Id.* at 1–2 (Page ID #72–73). In an opinion by the same judge who presided over Martin's trial, the trial court rejected Martin's ineffective-assistance claim, writing: "The Court ultimately denied the motion [to allow the disputed evidence]. The record shows that trial counsel made every effort to persuade the Court to admit evidence of the victim's prior sexual conduct." R. 6-19 (Mich. Cir. Ct. Op. & Order at 2–3) (Page ID #737–38).

On direct appeal, the Michigan Court of Appeals affirmed on the merits. With regard to the ineffective-assistance claim, it concluded that trial counsel was not constitutionally deficient on the ground that counsel *had* argued for admission initially, and, moreover, the witnesses who had ostensibly opened the door had not actually provided any reason to believe "that a renewed motion would have been successful." *Martin*, 2011 WL 445806, at *5. "In fact," the court reasoned, "the trial court's opinion implies that it would have denied a renewed motion. Accordingly, defense counsel was not ineffective, neither for his initial arguments nor for failing to renew the motion." *Id.* The court also rejected Martin's argument that the trial court had erred in excluding the disputed evidence, reasoning that neither the testimony of Gorman (the pediatrician) nor Allen (the forensic interviewer) gave rise to a need to admit the evidence and concluding that the "evidence [was] precluded by the rape shield law, and Martin has failed to show sufficient cause to circumvent the statutory prohibition." *Id.* at *7. The Michigan Supreme Court declined to hear the case on appeal. *People v. Martin*, 798 N.W.2d 788 (Mich. 2011).

Martin then filed a habeas petition in federal court. R. 1 (Petition for Writ) (Page ID #1). The district court issued an opinion and order rejecting Martin's claims, but observing that Martin had neglected to mention throughout his postconviction appeals the most telling evidence of ineffective assistance: that trial counsel had failed to renew the motion to admit the disputed evidence. R. 14 (Dist. Ct. Amended Op. & Order at 1–3, 31–33) (Page ID #840–42, 870–72). This version of the claim, the district court reasoned, was "much stronger" and "puts the claim in a significantly different and stronger evidentiary posture than what the state courts were presented with." *Id.* at 32 (Page ID #871). The district court explained, however, that it could not review that version of an ineffective-assistance claim at the present stage, given that that particular version of the claim had not yet been presented to the state courts. *Id.* at 33 (Page ID #872). The district court indicated that Martin could "file a motion for rehearing seeking to add his unexhausted claim to the petition and seeking an order holding the case in abeyance while he pursues relief in the state court." *Id.* at 33 n.5 (Page ID #872).

Martin disputed that the claim was unexhausted, but he also moved to amend (or correct) his habeas petition to include (or clarify) the failure-to-renew claim, and he further moved in the alternative to hold the case in abeyance while he pursued the unexhausted claim. R. 15 (Mot. for Reconsideration at 1) (Page ID #876); R. 16 (Mot. for Leave to Amend at 1) (Page ID #922). The district court granted the motion to amend, vacated its earlier order, and held the case in abeyance while Martin returned to state court. R. 19 (Dist. Ct. Op. & Order at 2) (Page ID #945). For their part, the Michigan state courts denied Martin's motion for relief from judgment pursuant to Michigan Court Rule 6.508(D)(2), concluding that Martin's "motion allege[d]

grounds for relief that were decided against the defendant in a prior appeal." *See* R. 24-4 (Mich. Cir. Ct. Op. & Order at 2) (Page ID #1105); *see also* R. 24-5 (Mich. Ct. App. Order) (Page ID #1108); R. 24-6 (Mich. Sup. Ct. Order) (Page ID #1206).

After Martin returned to federal court, the district judge who had previously handled his petition retired, and a new district judge was assigned to his case. The new district judge issued an order denying Martin's petition on all grounds, though granting him a certificate of appealability as to (1) his claim that the trial court's initial exclusion of the disputed evidence violated his right to present a defense and confront witnesses, and (2) his ineffective-assistance claim arising from trial counsel's failure to renew the motion to admit the disputed evidence. *See* R. 26 (Dist. Ct. Op. & Order at 12, 22, 31) (Page ID #1336, 1346, 1355). This appeal followed.

## II. DISCUSSION

### A. Standard of Review

This appeal concerns a federal habeas petition. We review the district court's conclusions of law de novo and its factual findings for clear error. *McCarley v. Kelly*, 801 F.3d 652, 660 (6th Cir. 2015). We are, as the district court was, constrained by the Antiterrorism and Effective Death Penalty Act (AEDPA), which prohibits federal courts from granting habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d). This case involves only the first of those two prongs.

The phrase "clearly established Federal law" in the first prong "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision," *Williams v. Taylor*, 529 U.S. 362, 412 (2000), and "[w]e may not employ circuit precedent 'to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced,'" *McCarley*, 801 F.3d at 661 (second alteration in original) (quoting *Marshall v. Rodgers,* 569 U.S. 58, 64 (2013)). The phrase "contrary to," meanwhile, applies when a "state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. And the phrase "unreasonable application of" applies when a "state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

These are exacting standards with regard to federal courts—and, correspondingly, deferential standards with regard to state courts. Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Consequently, "evaluating whether a rule application was unreasonable requires considering the rule's specificity," such that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-

case determinations." *Yarborough*, 541 U.S. at 664. In short, our duty is to be on patrol for "'extreme malfunctions in the state criminal justice systems,' not . . . ordinary error[s]." *Richter*, 562 U.S. at 102 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

We are also bound to recognize that state courts do not always parcel out their merits adjudications in perfect detail. Accordingly, "[w]hen a state court rejects a federal claim without expressly addressing that claim," we must "presume"—subject to rebuttal—"that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). "For example, a court in a state that interprets a parallel state and federal constitutional provision identically may decide that a discussion of the state claim adequately disposes of the duplicative federal claim." *Brown v. Romanowski*, 845 F.3d 703, 711 (6th Cir.), *cert. denied*, 138 S. Ct. 93 (2017). Similarly, when a party "treat[s] her state and federal claims as interchangeable, . . . it is hardly surprising [if] the state courts [do] as well." *Johnson*, 568 U.S. at 306. On the other hand, this otherwise "strong" presumption may be rebutted "when a state court rejects a federal claim 'as a result of sheer inadvertence.'" *Brown*, 845 F.3d at 711 (quoting *Johnson*, 568 U.S. at 303).[3]

---

[3]This rule also leaves open the possibility of differential review of the *subparts* of discrete claims. If, for example, a state court decision adjudicates the deficiency prong of an ineffective-assistance-of-counsel claim on the merits but does not reach the merits as to prejudice, we give AEDPA deference on the deficiency prong but review the prejudice question de novo. *See Caudill v. Conover*, 881 F.3d 454, 464 (6th Cir. 2018); *Hodges v. Colson*, 727 F.3d 517, 537 (6th Cir. 2013).

Finally, when asking whether a state court reached the merits of a claim, we "'look[] through' unexplained orders to the 'last reasoned' decision of the state courts," *Brown*, 845 F.3d at 711 (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991)), presuming that any summary affirmances from higher state courts "adopted the same reasoning" of the last reasoned state-court decision in the absence of a showing to rebut that presumption, *Wilson v. Sellers*, 584 U.S. ——, No. 16-6855, slip op. at 2 (Apr. 17, 2018). This rule "applies separately to each claim within a case," but it is otherwise a one-stop train: "we must still defer to the last reasoned state-court *opinion,* rather than try to string together a series of state *opinions* piecemeal *for each claim.*" *See Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 463 (6th Cir. 2015).

## B. Right to Present a Defense and Confront Witnesses

With those governing rules in mind, we first address Martin's claim that his right to present a defense and confront witnesses was impermissibly stifled when the trial court failed to allow him to introduce the disputed evidence. Although it is not clear that the trial court ever issued what we can treat as a dispositive ruling on this question, *see* R. 11-1 (Mich. Cir. Ct. Order) (Page ID #803), we will assume that the initial denial was definitive enough to burden cognizably Martin's rights. In any event, we conclude that there was no cognizable error.

At the outset, we note that while Martin and the Warden discuss these claims interchangeably, confrontation claims and right-to-present-a-defense claims are not doctrinally identical. *Compare, e.g.*, *Boggs v. Collins*, 226 F.3d 728, 736–43 (6th Cir. 2000) (analyzing right-to-confront challenge), *with id.* at 743–45 (analyzing right-to-present challenge). But because the two types of claims are closely related, *cf. Crane v. Kentucky,* 476 U.S. 683, 690

(1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)) (citations omitted)), and because Martin's two claims largely collapse into one common and overarching question—whether there was constitutional error, cognizable under AEDPA, in precluding the disputed evidence—we will not belabor the difference and instead will analyze the claims in close proximity.

We also note that AEDPA deference applies. The last reasoned state-court opinion in this case is the opinion of the Michigan Court of Appeals. Though it does not discuss the doctrinal contours of Martin's confrontation and defense-presentation rights as comprehensively as one might hope, the opinion's substantive rejection of the argument that either Gorman's or Allen's testimony required the admission of the disputed evidence is logically significant: if Martin's defense rights were not impermissibly hampered even with Gorman's and Allen's testimony having been offered, then it follows with stronger force that his rights were not impermissibly hampered by the trial judge's initial refusal to allow the disputed evidence. *See Martin*, 2011 WL 445806, at \*7. In short, with Martin himself having treated his claim as indivisibly encompassing (1) his confrontation right and his right to present a defense and (2) the trial court's initial denial and its ongoing denial following Gorman's and Allen's testimony, and with Martin's furthermore (3) having offered no other reason to conclude that AEDPA does not apply, we presume that there was a valid adjudication on the merits and thus apply AEDPA

deference.  *See Johnson*, 568 U.S. at 301, 305–06.  AEDPA review, in turn, forecloses Martin's claims.

To begin with, Supreme Court precedent makes clear that Martin's rights to confront witnesses and to present a defense are not absolute.  While cross-examination, for example, is an important trial right, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.").  Similarly, "[t]he right to present relevant testimony is not without limitation," but rather "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  *Rock v. Arkansas,* 483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi,* 410 U.S. 284, 295 (1973)).

Here, the disputed evidence was excluded, as Martin concedes, pursuant to a statutory directive that the Supreme Court itself has explicitly blessed in certain circumstances.  *See Michigan v. Lucas*, 500 U.S. 145, 149–50 (1991) ("The Michigan statute represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy.").  That does not mean, of course, that Martin automatically loses.  *See id.* at 151.  But it does mean that we are reviewing the Michigan Court of Appeals's conclusion regarding a more sensitive, case-by-case analysis applying a fairly

16

general rule. *See id.* ("Restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" (quoting *Rock*, 483 U.S. at 56)); *see also Gagne v. Booker*, 680 F.3d 493 (6th Cir. 2012) (en banc) (plurality opinion) ("*Lucas* stands for the proposition that the trial court must balance a state's interest in excluding certain evidence under the rape shield statute against a defendant's constitutionally protected interest in admitting that evidence, on a case-by-case basis—neither interest is superior *per se*." (citation omitted)). And especially on habeas review, more general rules mean "more leeway" for courts "in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664.

The Michigan appellate court's conclusion that exclusion was permissible was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). In habeas cases discussing the Confrontation Clause, we have set out a method for reviewing such questions. "When," as here, "a trial court has limited cross-examination from which a jury could have assessed a witness's motive to testify, a court must take two additional steps," *Lewis v. Wilkinson*, 307 F.3d 413, 421 (6th Cir. 2002):

> First, a reviewing court must assess whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory of . . . improper motive. Second, if this is not the case, and there is indeed a denial or significant diminution of cross-examination that implicates the Confrontation Clause, the Court applies a balancing test, weighing the violation against the competing interests at stake.

*Id.* (alteration in original) (quoting *Boggs*, 226 F.3d at 739).

In this case, we easily conclude that the jury did *not* have "enough information despite the limits placed on otherwise permitted cross-examination, to assess the defense theory of . . . improper motive." *See id.* (alteration in original) (citations omitted). Though the defense was able to offer *some* suppositions as to why S.W. might make these charges up—the cell phone, the jealousy of M.M.—the defense's theories were hardly incontrovertible, as the prosecution well noted. *See* R. 6-8 (Trial Tr. Vol. IV at 59–60, 66) (Page ID #434–35). The disputed evidence— particularly that Martin had threatened to press charges against Cartier—was, comparatively speaking, a stronger theory, and it was wholly excluded.

The second question, however—whether Martin's interest in introducing this evidence outweighs the contrary interests—is where Martin's challenge stumbles. Our analysis in *Lewis*, which went the other way, helps explain why. *Lewis* involved a defendant, on trial for rape, who had sought to introduce portions of the complaining witness's diary in which she had arguably admitted that she had in fact consented to the sexual intercourse at issue and had instead pressed charges because she was angry with both the defendant and herself for noncriminal behavior. *Lewis*, 307 F.3d at 417–18. Those statements, we noted, had "substantial probative value as to both consent and the victim's motive in pressing charges against appellant." *Id.* at 422. The former feature—direct evidence that the complainant had consented—we described as particularly important. *See id.* All that outweighed, we reasoned, the danger of putting the (adult) victim's "sexual history with other men" on trial. *See id.*

Martin's case is different. While the disputed evidence presented a relatively stronger impeachment theory, that theory went to actual guilt only tangentially, and its probative value

was still low in absolute terms. The theory would have been that Martin threatened to call the police against Cartier during the spring and summer, but did not, and then further quarreled with his teenaged daughter in October about her cell-phone plan, reiterating his opposition to her relationship. *See* R. 2-2 (Martin Aff.) (Page ID #94–95); Appellant's Br. at 25. That itself is a far cry from clear cause to doubt such serious accusations by a sixteen-year-old against her father, and the cause for skepticism here is further limited by the corroborative evidence from O.R. and the uncontroverted testimony from both sides that Martin regularly shared a bed with his daughter.[4] *See, e.g.*, R. 6-7 (Trial Tr. Vol. III at 16, 124, 27) (Page ID #381, 408). And on the other side of the balance, we find the same considerations supporting the rape-shield law that the Supreme Court expressed in *Lucas*, 500 U.S. at 149–50, interests that press even more strongly here in the case of a minor, *see, e.g.*, *Maryland v. Craig*, 497 U.S. 836, 852–53 (1990). None of this means that we, if put to the question, would necessarily rule the same way in a federal case. But because the probative value of the disputed evidence was low in absolute terms and the countervailing interests were significant, "fairminded jurists could disagree" about the

---

[4]We note, for completeness, that this case is also different from one in which evidence of a complainant's prior sexual history might be necessary to rebut physiological proof offered by the prosecution. *See, e.g.*, *LaJoie v. Thompson*, 217 F.3d 663, 671 (9th Cir. 2000); *United States v. Begay,* 937 F.2d 515, 523 (10th Cir. 1991). Martin, to be clear, maintains that his case *is* that type of case, arguing that Gorman's testimony that she had not felt the need to perform another pelvic exam in October suggested to the jury that Martin was the only possible source of physiological proof. *See* Appellant's Br. at 26. But the Michigan Court of Appeals rejected that argument, and we understand why: neither Gorman nor any other witness ever offered physiological proof, and thus Martin's theory turns on an inference from one sentence of Gorman's testimony that was neither logically compelled nor encouraged by the prosecution. *See Martin*, 2011 WL 445806, at *7; R. 6-7 (Trial Tr. Vol. III at 9–10) (Page ID #379). While a more damning suggestion within the government's case might well alter our calculus, this one does not.

correct ruling here. *See Richter*, 562 U.S. at 101. And that means that, when we analyze the claim as a Confrontation Clause issue, Martin's claim fails on AEDPA review.

For essentially the same reasons, and via a similar analysis, Martin's claim also fails on AEDPA review if analyzed under precedent governing the right to present a defense. As we have explained: "Rules excluding evidence 'do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purpose they are designed to serve,'" and "exclusion . . . is arbitrary or disproportionate 'only where it has infringed upon a weighty interest of the accused.'" *Boggs*, 226 F.3d at 743–44 (quoting *United States v. Scheffer,* 523 U.S. 303, 308 (1998)) (citations and quotation marks omitted); *see also Gagne*, 680 F.3d at 514 (plurality opinion) ("*Crane* stands for the general proposition that 'the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense'—such that the court may not 'exclude competent, reliable evidence . . . central to the defendant's claim of innocence[,] . . . [i]n the absence of any valid state justification.'" (alterations in original) (quoting *Crane*, 476 U.S. at 690–91)). For example, where excluded evidence is "not so highly probative" or "weighty," we generally do not consider it "constitutionally guaranteed" and instead defer to a state court's discretion to exclude it. *See Boggs*, 226 F.3d at 745. On the other hand, where the excluded evidence seriously challenges an otherwise suspect prosecutorial case, *see Olden v. Kentucky*, 488 U.S. 227, 233 (1988), and moreover where the purposes of exclusion are either categorically slight, *see Crane*, 476 U.S. at 690–91, or at least seriously attenuated in the instant case, *see Chambers*, 410 U.S. at 298, 302–03, clearly established law points in a

different direction. Here, however, the evidence was not so strong, nor the contravening interest sufficiently weak, to entitle Martin to the relief he seeks on federal habeas review.

## C. Ineffective Assistance of Counsel

That leaves Martin's claim that his trial counsel provided constitutionally ineffective assistance by failing to renew the motion to admit the disputed evidence. Again, there is some brush to clear. First, there is the Warden's argument that we should dismiss this claim altogether because "the district court overstepped its role as a neutral arbiter of disputes," Appellee's Br. at 18, in its order discussing the problematic framing of Martin's claim, *see* R. 14 (Dist. Ct. Amended Op. & Order at 1–3, 31–33) (Page ID #840–42, 870–72). The Warden's only authority for this position is highly generalized dictum from an unpublished decision. *See Young Bok Song v. Gipson*, 423 F. App'x 506, 510 (6th Cir. 2011) ("[W]e decline to affirmatively require courts to ferret out the strongest cause of action on behalf of *pro se* litigants. Not only would that duty be overly burdensome, it would transform the courts from neutral arbiters of disputes into advocates for a particular party. While courts are properly charged with protecting the rights of all who come before it, that responsibility does not encompass advising litigants as to what legal theories they should pursue."). While Martin does appear to have read and used the district court's own dictum to refine his legal strategy, the fact that the district court had no affirmative duty to recognize the relevant shortcomings in Martin's appellate counsel's presentation of Martin's claim did not prevent the district court from commenting on that claim. The district court's action was supererogatory, not prohibited.

Second, the Warden argues that Martin's claim falls outside of AEDPA's statute of limitations. *See* 28 U.S.C. § 2244(d)(1); Appellee's Br. at 19. True enough that Martin amended his claim outside of AEDPA's one-year limit. But the one-year limit is not fatal if the amended petition "relat[es] back" to the original petition, and an amendment relates back "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005). The Warden's answer to this problem is to suggest that the addition of *one* operative fact—that the initial motion to introduce the disputed evidence was denied without prejudice—is enough to preclude us from finding a "common core of operative facts." Appellee's Br. at 20. But this answer is odd, to say the least, given that the Michigan courts all concluded, contrary to the first district judge, that Martin's original initial ineffective-assistance claim and his amended ineffective-assistance claim did not simply share a common core of operative facts, but actually were *the exact same claim. See* R. 24-4 (Mich. Cir. Ct. Op. & Order at 2) (Page ID #1105); R. 24-5 (Mich. Ct. App. Order) (Page ID #1108); R. 24-6 (Mich. Sup. Ct. Order) (Page ID #1206). Suffice it to say that this is not a winning argument for the Warden.

Third, Martin references a claim for ineffective assistance of *appellate* counsel that both the district court and the Warden appear to ignore. The Michigan courts, however, were presented with this claim, *see* R. 24-2 (Def.'s Mot. for Relief from J.) (Page ID #1022–25), and they each implicitly rejected it on the merits, *see Johnson*, 568 U.S. at 301; *Richter*, 562 U.S. at 99, concluding, as just discussed, that appellate counsel had *not* failed to present the failure-to-renew version of the claim, s*ee* R. 24-4 (Mich. Cir. Ct. Op. & Order at 2) (Page ID #1105);

R. 24-5 (Mich. Ct. App. Order) (Page ID #1108); R. 24-6 (Mich. Sup. Ct. Order) (Page ID #1206). Given the broad language in Martin's initial state-court petition, R. 2-2 (Def.'s Mot. for New Trial at 1–2) (Page ID #72–73), our deferential standard on habeas review, and the deference that we give to appellate attorneys with regard to how to couch their appeals, *see Jones v. Barnes*, 463 U.S. 745, 754 (1983), we do not see grounds here to reject the state courts' judgment.

Fourth, we note that, contrary to the Warden's argument, *see* Appellee's Br. at 20–21, our resolution of Martin's claim regarding the exclusion of the disputed evidence does *not* automatically dispose of his ineffective-assistance claim. True, the district court noted—rightly—that if Martin were to *win* the former claim, then it would be unnecessary to reach the latter claim. *See* R. 26 (Dist. Ct. Op. & Order at 12) (Page ID #1336). But the Warden's brief commits a logical fallacy in assuming that this street runs in both directions. Rather, just because federal law does not *require* the disputed evidence to have been admitted does not mean that federal law categorically *prohibits* the disputed evidence.[5] In other words, there is still the cognizable possibility that, had counsel renewed his motion, the trial judge would have, in her discretion, granted the motion—and that, in turn, the disputed evidence would have changed the outcome of Martin's trial.

With all that being said, we proceed to the merits of Martin's ineffective-assistance claim. "Judicial scrutiny of counsel's performance," the Supreme Court has explained, "must be

---

[5]And, indeed, it does not categorically prohibit such evidence. *See, e.g.*, *Lucas*, 500 U.S. at 151.

highly deferential." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). More specifically, to succeed in proving constitutionally ineffective assistance, a petitioner must show not only (1) that "counsel's performance was deficient," but also (2) that this "deficient performance prejudiced the defense." *Id.* at 687. The deficiency prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* This prong "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Richter*, 562 U.S. at 110. The prejudice prong, meanwhile, "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This prong, in other words, requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability," in turn, "is a probability sufficient to undermine confidence in the outcome." *Id.*

Here, the last reasoned opinion to address this claim is again the opinion from the Michigan Court of Appeals, *see Martin*, 2011 WL 445806, at *5, in light of its own confirmation that it in fact reviewed this version of the question the first time around, *see* R. 24-5 (Mich. Ct. App. Order) (Page ID #1108). Although the state appellate court's reasoning focused largely on deficiency, it did appear to reach prejudice when it concluded—perhaps alluding to the fact that the same trial judge who denied Martin's initial appeal also presided over his trial—that "[i]n fact, the trial court's opinion implies that it would have denied a renewed motion." *Martin*, 2011 WL 445806, at *5. "Accordingly," the court concluded, "defense counsel was not ineffective,

24

neither for his initial arguments nor for failing to renew the motion." *Id.* Given the presumptions that we are bound to follow on habeas review and the fact that Martin has not offered anything to rebut them, *Johnson*, 568 U.S. at 301; *Richter*, 562 U.S. at 99, AEDPA deference applies to both prongs of the *Strickland* inquiry. Accordingly, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

With regard to deficiency, we find it hard, even on this deferential standard of review, to think of a reasonable argument that Martin's counsel satisfied *Strickland*'s standard. After all, while Martin's trial counsel evidently did an acceptable job of litigating the motion initially, there was zero downside to renewing it given the terms of the trial judge's order, *see* R. 11-1 (Mich. Cir. Ct. Order) (Page ID #803), and there was clearly some potential upside, given Martin's paucity of alternative defense theories. True, as the Warden argues, such evidence might have been only "minimally helpful," Appellee's Br. at 23—but that is a point better geared toward an analysis of prejudice, an inquiry to which we turn in a moment. Meanwhile, the Warden's other explanations for the omission—such as a fear of inviting aspersions against Martin from the jury for his failure *actually to call* the police, or a fear of inviting belief among the jury that Martin was just jealous of Cartier, *id.* at 24—are simply too implausible under the circumstances. Martin was on trial for the repeated sexual abuse of his teenaged daughter, and the defense's entire theory as to why the charges were fabricated boiled down to a cell-phone plan, a sibling rivalry, and the fickleness of teenagers. *See* R. 6-8 (Trial Tr. Vol. IV at 59–60) (Page ID #434). It is hard to see, in light of the circumstances, how it could have been

25

objectively reasonable to conclude that the (highly speculative) risks attending the disputed evidence outweighed the (much needed) benefit of a relatively more compelling theory.

Even so, the theory supported by the disputed evidence was just that: *relatively* more compelling. To prevail on the prejudice prong, Martin must show more than a simple comparative advantage; after all, a pebble is not weighty simply because it is many times larger than a grain of sand. Rather, the prejudice prong requires Martin to establish "a reasonable probability that," had his trial counsel renewed the motion, "the *result of the proceeding* would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). The stringency of federal habeas review, meanwhile, requires us to affirm so long as it was reasonable for the state appellate court not to find prejudice. *See Richter*, 562 U.S. at 105. There are several reasons that Martin cannot meet this particularly high bar.

First, as the Michigan Court of Appeals noted, there is significant cause to doubt that the trial court would have exercised its discretion to grant the motion even if Martin's trial counsel had renewed it. *See Martin*, 2011 WL 445806, at *5; *see also* R. 6-19 (Mich. Cir. Ct. Op. & Order at 2–3) (Page ID #737–38). Nothing of relevance had changed since the trial court's pretrial denial of the motion: Gorman's testimony, as already discussed, did not offer physiological evidence that would have invited rebuttal. *See* R. 6-7 (Trial Tr. Vol. III at 9–10) (Page ID #379). And Allen's simple explanation of why forensic interviewers use alternative hypotheses did not, contrary to Martin's argument, *see* Appellant's Br. at 11, invite the conclusion that her team had ruled any alternative hypotheses out. *See* R. 6-7 (Trial Tr. Vol. III at 103–04) (Page ID #402–03). In short, while counsel had nothing to lose, that does not mean

that he was likely to win. And the fact that he was unlikely to win makes prejudice a tougher burden. *Cf. Downs v. United States*, 879 F.3d 688, 691 (6th Cir. 2018) (finding no ineffectiveness where counsel "failed to seek reconsideration" of a defendant's sentence where "such a motion would have been futile").

Of course, if the disputed evidence were sufficiently exculpatory, even a lower chance of gaining its admission might suffice for prejudice purposes. But here, the disputed evidence, while better than any other card in Martin's hand, was not especially powerful in absolute terms. Even if it had been admitted, that theory still would have been up against powerful and graphic testimony from S.W. R. 6-6 (Trial Tr. Vol. II at 40–68) (Page ID #344–51). True, Martin's trial counsel had succeeded in pointing out inconsistencies in the different accounts that S.W. had provided over the course of the investigation, *id.* at 82, 97–101, 109–12, 116–18, 121–25 (Page ID #354, 358–59, 361–65), and had called into question other aspects of her behavior during the time of the alleged abuse, *id.* at 83, 87–88, 102–05, 127–30, 135 (Page ID #355–56, 359–60, 366, 368). But even counsel admitted that some of these inconsistencies were "minor," R. 6-8 (Trial Tr. Vol. IV at 52) (Page ID #432), and the jury had heard expert testimony that sexual-abuse victims do not always remember events in perfect detail and that it is not unusual for adolescent victims of sexual abuse by family members to delay reporting the abuse and to try to act as if nothing bad is happening, *see* R. 6-7 (Trial Tr. Vol. III at 54–59, 64–65, 84–86, 92–101 (Page ID #390–91, 393, 398, 400–02).

Meanwhile, the jury had also heard testimony from S.W. that she had confided in O.R. during February 2008. R. 6-6 (Trial Tr. Vol. II at 45) (Page ID #345). If accurate, the timing of

27

that conversation eviscerates Martin's argument, given that he asserts having first learned of S.W.'s sexual relationship with Cartier during spring 2008 and having first mentioned criminal liability for Cartier during summer 2008. R. 2-2 (Martin Aff. at 1) (Page ID #94). To be fair, and as Martin points out, Reply Br. at 4–5, O.R. was unable to confirm the February date. R. 6-7 (Trial Tr. Vol. III at 16, 21–23) (Page ID #381–82). Nevertheless, O.R. was able to confirm that the conversation happened, *id.*, and thus the combination of her testimony and S.W.'s further reduces the chances that the disputed evidence, even if admitted, would have yielded a different result in Martin's trial.

In short, prejudice is at best debatable, and we are therefore not empowered on federal habeas review to disturb the Michigan Court of Appeals's rejection of Martin's ineffective-assistance claim. *See Richter*, 562 U.S. at 105. This claim also fails.

### III. CONCLUSION

The clash between a defendant's trial rights and the state's legitimate interest in protecting complainants' sexual histories is never simple. Because the Michigan Court of Appeals did not contravene or unreasonably apply clearly established law in denying Martin's claims, we **AFFIRM**.